E-FILED
Friday, 19 January, 2018  04:48:38 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

GLENN VERSER,                )

                                )

        Plaintiff,          )

                                )     No. 14-cv-3060

        v.               )     Honorable Jonathan E. Hawley

                                )

                                )

RYAN ERICKSON,          )

                                )

        Defendant.     )

## PLAINTIFF'S REPLY IN SUPPORT OF HIS MOTION FOR SANCTIONS

### I.     INTRODUCTION

On October 29, 2014, Defendant Ryan Erickson – through his lawyers at the Office of the Illinois Attorney General – answered written interrogatories and swore under oath that he had no recollection of placing Glenn Verser in segregation on May 24, 2013.  Mr. Erickson never changed that response.  Thus, when Mr. Verser finally got appointed counsel, his attorneys relied on Erickson's sworn answers in preparing their case: as he had no independent memory, Erickson would be limited to the statements he made in written documents contemporary to the time of the incident, and perhaps any policies or procedures that could possibly explain what was written there.

But things changed when Erickson took the stand at trial.  Now, Mr. Erickson testified that indeed, he *did* remember the event.  He now remembered being called by other officers to Mr. Verser's cell, where Mr. Verser was irate, yelling, and being disruptive about a television set.  He now remembered that Mr. Verser had refused to re-enter his cell.  He now remembered that, following the incident, he was so upset about what had happened that he personally followed up with the Property Officer to see whether Mr. Verser had been correct that a certain

television did rightly belong to him. And Mr. Erickson now remembered that he had taken the extraordinary step of emailing the prison's hearing officer to tell him that Mr. Verser's charge for refusing housing should expunged, and that Mr. Erickson had advocated for Plaintiff to be allowed out of segregation early. When questioned about his new-found memory at trial, Mr. Erickson simply stated that it was his "standard practice" to answer "I don't remember" in answer to interrogatories when he has been sued.  According to Mr. Erickson, he simply had not expected that Mr. Verser would make it as far as he had – in other words, his answers would not ultimately matter, because he would never have to sit on a witness stand and defend himself under oath, in front of a jury.

In defense of Mr. Erickson's behavior, his attorneys now argue that it should be forgiven for two main reasons.  First, they argue that the unrevealed testimony was not surprising and, therefore, not prejudicial.  That is untrue.  Second, they suggest that he should be forgiven for not supplementing his responses earlier because there is no reason why a layperson should be aware of his obligation to supplement discovery.  With respect to Erickson's testimony that he was not aware of the duty to supplement his answers to interrogatories, their brief ask the rhetorical question: "Why would he be?" (Doc. 154, at 10.)

The answer to counsels' question is so obvious it should not even need to be written here: Ryan Erickson should have been aware of his discovery duties *because his lawyers were supposed to tell him*.  Their cavalier suggestion that no client should be held to be aware of such responsibilities highlights exactly why the conduct in this case should be sanctioned.  Lawyers at the Illinois Office of the Attorney General – whether trial counsel or any of the multiple attorneys who preceded them – were under the obligation to ensure that their client's answers to interrogatories were correct and complete, and were under the obligation to inform their client of

2

the duty to supplement or amend incorrect answers. They were under the duty to instruct their client of the importance of truthful answers and the meaning of a sworn verification under penalty of perjury. They were required to correct the misconception that it is appropriate to simply answer, "I don't remember" to a pro-se prisoner's interrogatories, regardless of whether you actually do remember, as a "standard practice."

The effect of defendants' conduct was that a man sitting in prison, prosecuting his cause *in forma pauperis*, was provided apparently false information that never got corrected, and that his attorneys relied upon that information in crafting their case. This is not excusable. Some conduct is so bad that it needs to be punished and deterred. Federal Rule of Procedure 37 allows this Court judicial discretion precisely for this purpose, and it should be exercised here.

## II.    ARGUMENT

Defendant's counsel does not argue that there was no discovery violation. There is essentially no dispute that there was. Rather, they argue that sanctions are not warranted because there was no surprise, the new testimony was therefore harmless, and plaintiff's counsel had the opportunity to cure the problem before trial. They also argue that neither defendant nor counsel acted with the level of unreasonableness required to warrant sanctions. For the reasons described below, counsel is wrong on each point.

### A. The Testimony Was Surprising

Defense counsel argues that "Erickson's trial testimony was consistent with the documents disclosed and the parties' discussions related to the pretrial order." ECF 154, at 3. That is fundamentally untrue. Neither plaintiff, nor his counsel, were ever informed that Erickson had any memory of the event. That is why, when counsel learned that Erickson would testify that plaintiff did not have his medical permit on his person, plaintiff's counsel sought last-minute,

pretrial discovery regarding whether there was a policy or procedure requiring an inmate to have a medical permit on his person.  The Court granted that request.  When defendant's counsel subsequently informed plaintiff's counsel that no such written policy existed, plaintiff's counsel reasonably concluded that Erickson would not be able to explain why he required Mr. Verser to have his permit "on his person" that night.  Further conversations with Mr. Verser, in addition to Mr. Alan Dallas (who was first contacted on November 7 regarding his subpoena to testify in the case (*see* Ex. 1, Declaration of Alexis Garmey Chardon ("Chardon Dec**.", ¶**7)) confirmed that the only reason why a prisoner would need to have a permit so readily available is if it were an emergency situation, such as the inmate causing danger.  Since there was no evidence of that, and Erickson could not remember the incident, counsel anticipated that Erickson would unable to provide any plausible explanation for his refusal to honor the permit.

Given the inadequate disclosures, plaintiff's counsel did not understand, leading up to trial, that Erickson had an actual memory of the event and recalled that he was called to the unit because plaintiff was being disruptive or dangerous.  Knowledge that Erickson was going to testify that he remembered Mr. Verser being disruptive outside his cell would have fundamentally shifted trial strategy.  Without such knowledge, counsel went into trial with the entirely reasonable expectation that Erickson would be boxed in at trial by the documents themselves.

### 1.   The Supplemental Response

On January 18, 2018, Defendant's counsel filed a motion to supplement their response with "new" facts allegedly pertinent to the issue of surprise.  (ECF 155.)  The motion was granted, and the Supplemental Response filed on January 19.  (ECF 156.)  The Supplemental Response contains material inaccuracies.

The Supplemental Response quotes the pretrial conference to suggest that Ms. Chardon knew that Mr. Erickson was going to change his story at trial and recall what had occurred with respect to the medical permit.  Nothing in the quoted portion of the transcript supports that theory, however.  Counsel was informed that Mr. Erickson would testify that Mr. Verser did not have the permit on her person.  But because Mr. Erickson did not have a memory of the incident, counsel believed up until trial that his testimony regarding Mr. Verser's failure to have the permit on his person could only be based on what was written in his response to Plaintiff's grievance in combination with some universal policy, practice, or procedure regarding how such a situation would or should have been treated.  For that reason, plaintiff's counsel sought pre-trial discovery regarding whether any such policy or protocol existed.  Nothing on the pretrial conference could have suggested that plaintiff's counsel was aware that Mr. Erickson was going to have a memory of the incident at trial – in particular, a specific memory about asking Mr. Verser for his permit, a specific memory that Mr. Verser was being disruptive or dangerous, or a specific memory that he had later acted to see that the ticket was expunged.

As to the affidavit of Mr. Alan Dallas, it is simply incorrect on a couple of crucial points. Most importantly, at no point before trial began – and certainly not a "month" before trial – did Lt. Dallas and Ms. Chardon discuss whether it was common for correctional officers to contact hearing officers to have a ticket expunged.  (Chardon Dec., ¶9, 10, 11.)   In fact, Mr. Dallas did not speak to Ms. Chardon or any other counsel for plaintiff until November 7, 2017, which was only five days before trial.  (Chardon Dec., ¶7.)[1]  On that day, Mr. Dallas called Ms. Chardon to confirm that he had received her trial subpoena. They discussed the ticket expungement authored by Mr. Dallas, and whether he remembered the particular ticket, and whether there were any

---

[1] Defense counsel inexplicably states that Mr. Dallas said he first spoke to Ms. Chardon a "month" before trial (ECF 156, at 3), but it is not clear from where that date is derived; Mr. Dallas's declaration does not provide a date for their first conversation.

policies or procedures requiring a prisoner to carry a permit on his person.   (Chardon Dec., ¶7.)
Ms. Chardon recorded the substance of her conversation in a written memorandum to the file,
and her memorandum confirms her memory of the conversation.  (Chardon Dec., ¶7.)[2]  Emails
exchanged among counsel also corroborate this timeline; for example, Ms. Chardon requested
Lt. Dallas's contact information in an email to defense counsel on October 23, because she did
not have it.  (Chardon Dec., ¶1.)  On November 3, she asked defense counsel in an email to let
her know if they were able to reach Lt. Dallas to confirm that he would be able to attend trial,
because she had been unable to reach him by that point.  (Chardon Dec., ¶5.)  On November 7,
she emailed counsel for Defendant to inform them that she had contacted Lt. Dallas.  (Chardon
Dec., ¶6.)

On November 13, 2017, during opening statement, counsel for plaintiff first heard that
Erickson had allegedly contacted a hearing officer to expunge a ticket.  (Chardon Dec., ¶10.)
That evening, Mr. Dallas kindly called plaintiff's counsel to confirm that he would be able to
attend court to testify following day (even though he had spent the day in invasive outpatient
surgery and had traveled six hours to and from the hospital).  (Chardon Dec., ¶11.)  On the
November 13 conversation, Plaintiff's counsel asked whether it was common for an officer to
contact the hearing officer to expunge a ticket.  (Chardon Dec., ¶12.)  Counsel recollects that the
answer was that it was unusual, but Mr. Dallas recollects stating that such an event was common.
(The difference of memory on that point is inconsequential to this motion.)

The Supplemental Response makes a significant and material misstatement, claiming that
counsel for defendant told counsel for plaintiff one month before trial that Erickson would testify
that he had asked for the ticket to be expunged.  Specifically, the Supplemental Response states:

---

[2] The memorandum is privileged attorney work product. Plaintiff does not object, however, to in camera inspection
by the Court.

"Plaintiff's Counsel knew to ask Lt. Dallas" about whether it is common for a correctional officer to contact the hearing board to expunge a ticket because one month before trial "*Defense Counsel informed her that Erickson will testify that he asked the Adjustment Committee to expunge the ticket before the hearing.*"  ECF 156, at 3 (emphasis added).  The foregoing statement is untrue.  (Chardon Dec., ¶10.)  Tellingly, this important assertion could have been made in the defendant's original Response to plaintiff's motion, but it was not.  (It is also unsupported by any evidence.)  Instead, it was only after learning of Lt. Dallas's (faulty) memory that counsel for defendant now asserts that they told Ms. Chardon about the expungement testimony a month before trial. This context suggests that defense counsel's new claim that they told Ms. Chardon about the testimony a month before trial is a mistaken, after-the-fact assumption reached in order to make sense of Mr. Dallas's faulty memory (because without prior disclosure from the defense, Ms. Chardon could not have known to ask such a question a month before trial).

Regardless, this he-said/she-said regarding telephone conversations with a third-party witness (and the extremely unusual need for an attorney to file a declaration attesting to the content of such conversations) further demonstrates why discovery rules should be followed in the first place.  By providing for an orderly, written exchange of truthful information, the discovery rules are set up to prevent this kind of problem.  Defense counsel has had to resort to the third party affidavit to prove up its own conduct precisely because the rules were not followed here.

## B.  The Testimony Was Harmful

Defendant's counsel also argues that the discovery violation should be forgiven because it was harmless.  According to counsel, because plaintiff never specifically asked in his first set of interrogatories what happened moments before the incident, or the day after, Erickson was never

required to supplement his answer when he realized that he did have a memory of the night.  But while Plaintiff's first round of discovery may have been narrow, Erickson's answers were not. He said that he had no memory of the incident whatsoever.  Plaintiff and his counsel relied on that answer going into trial, as they were entitled to do.

Plaintiff's trial strategy was simple: Erickson would be backed into a box created by the documentary evidence, and the box he was in would not make any sense.  For example, it does not make sense that Mr. Erickson had ticketed Mr. Verser for "refusing housing" when Mr. Verser was already in his cell (there being no evidence, prior to trial, to the contrary).  Moreover, Plaintiff's First Amendment claim was supported by the fact that there was no reason for Erickson to have been at Mr. Verser's cell in the first place, raising the suggestion that he was only there to get Mr. Verser to quash his grievance.  With a newly cured memory, though, Erickson was able to explain his presence at the cell by testifying that he had been called there because Mr. Verser was actually outside of his cell, yelling.  Finally, the fact that Erickson's ticket against Verser was later exonerated by the disciplinary review board strongly suggested that the original charge was a trumped-up cover for Erickson's real purpose of quashing the grievance.  But with Erickson's new memory of having personally investigated the reason for Mr. Verser's "disruptive" behavior, and his new memory of having personally taken the initiative to see that the ticket was expunged, Mr. Erickson was able to turn these facts around in a way that made him look like a hero – all as a surprise to plaintiff and his lawyers.

Defense counsel makes the argument that the discovery violation was not harmful and/or could have been cured because Mr. Verser was "savvy pro se litigant" who knew how to file a motion to compel discovery if he felt unsatisfied.  To that, plaintiff responds that it is unfair to for defendant charge him with being "savvy" enough to be able to enforce all of the Federal

Rules of Civil Procedure – and to excuse his own bad behavior on that account – simply because he was forced over the course of this litigation to file three motions to compel discovery. *See* ECF 36 (motion to compel answers to first interrogatories); ECF 50 (renewed motion re: same); ECF 53 (motion to compel initial disclosures). This essentially boils down to arguing that Mr. Verser did not deserve to rely on Mr. Erickson's sworn interrogatory answers because he should have known better than to assume Erickson was telling the truth, and only adds insult to the injury already inflicted on plaintiff by defendant's brazen attitude toward discovery.

Moreover, in order to correct the false inference created from defendant's Response, it must be noted that Mr. Verser *did* serve a second set of more targeted discovery requests on Defendants, in May 2015. Ex. 2. These were never answered. Plaintiff's counsel did not raise this failure in the motion for sanctions because the failure to answer the second round of interrogatories is beside the point. Upon being appointed to the case, counsel did not press for answers to the second interrogatories because no answers were necessary: after all, *Erickson did not remember the event*. Based on Erickson's lack of memory, such additional discovery would create nothing more than a needless cost to the parties. If Mr. Erickson had supplemented his original answers to notify plaintiff that he had a memory, that would clearly have necessitated more discovery (including pushing for answers to Plaintiff's Second Interrogatories).[3] And, of course, it would have required a trial strategy that was not built around defendant's lack of memory.

### C.  The Misconduct Was Objectively Unreasonable

Finally, defendant's counsel argues that sanctions should not issue in this case because there was no "culpable state of mind." As the cases cited by defense counsel demonstrate, the test is

---

[3] Defense counsel points to no authority supporting the suggestion that it is Plaintiff's burden to show how discovery would have proceeded differently had the violation not occurred.

whether the behavior is "objectively unreasonable." *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000).  Severe sanctions are warranted where behavior was "abusive." *Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir. 1996).

Defendant testified at trial that he understood what "penalty of perjury" means when he signed his answers to interrogatories and took the stand.  Yet he also answered that his "standard practice" is to simply answer, "I don't remember" to all interrogatories.  That "standard practice," perpetrated with the complicity of the attorneys who failed to explain to him the obligation to answer and supplement discovery truthfully, meant that a plaintiff who was representing himself *pro s*e and *in forma pauperis* never got the full truth, until the day he was surprised by it in court.  Now, his counsel defends such conduct by arguing that plaintiff should have known better and pushed for more discovery from defendant, even though defendant had sworn under oath he could not remember the incident (ECF 154, at 6-7).  Counsel also argues that there is no reason why defendant should have known of his duty to supplement incorrect answers (*see* ECF 154, at 10, asking "Why would he be [aware of his duty to supplement discovery]?")). If discovery conduct is ever objectively unreasonable or abusive, it is here.  And there could be no clearer case for the necessity of sanctions as a deterrent than there is here.

### III.    CONCLUSION

Rule 37(c) makes clear that, in addition to or instead of barring testimony, any other sanctions may be ordered.  F.R.C.P. 37(C)(1).  The Court should impose an appropriate sanction – including a new trial for Mr. Verser, attorneys' fees, and whatever other sanction the Court sees fit –  to deter the "standard practice" of disregard for the rules of discovery.  Without such sanctions, the "standard practice" will be free to go on, unpunished, to the detriment of the next prisoner trying to litigate against defendant or his counsel.

Respectfully submitted,

/s/ Alexis G. Chardon

Alexis G. Chardon
Stephen H. Weil
Weil & Chardon LLC
333 S. Wabash, Suite 2700
Chicago, IL 60604
(312) 585-7404
ali@weilchardon.com
steve@weilchardon.com

*Counsel for Plaintiff Glenn Verser*

## **CERTIFICATE OF SERVICE**

I certify that on January 19, 2018, the foregoing document was filed through the District Court's CM/ECF automated docketing system thereby causing service upon all counsel of record.

/s/ Alexis G. Chardon

*Counsel for the Plaintiff*